F8IHGOMH                        Hearing

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   JACQUELINE GOMEZ, et al.,

4                   Plaintiffs,

5            v.                           15 CV 3326 (CM)

6   LACE ENTERTAINMENT, INC., et
    al.,
7
                    Defendants.
8
    ------------------------------x
9                                         New York, N.Y.
                                          August 18, 2015
10                                        10:00 a.m.

11  Before:

12                    HON. COLLEEN MCMAHON,

13                                        District Judge

14                    APPEARANCES

15  HEPWORTH GERSHBAUM & ROTH PLLC
         Attorneys for Plaintiffs
16  BY:  DAVID A. ROTH
         REBECCA PREDOVAN
17
    SIRKIN KINSLEY & NAZZARINE, CO. LPA
18       Attorneys for Defendants
    BY:  JENNIFER MARIE KINSLEY
19

20

21

22

23

24

25

F8IHGOMH                          Hearing

1          (Case called)

2          MR. ROTH:  David Roth, Hepworth Gershbaum Roth,

3     plaintiffs.

4          MS. PREDOVAN:  Rebecca Predovan, Hepworth Gershbaum

5     Roth, plaintiffs.

6          MS. KINSLEY:  Jennifer Kinsley for defendants, Anthony

7     Capeci and MLB Enterprises.

8          THE COURT:  Okay.  Good morning, everybody.  Have a

9     seat.

10          Thank you for the submissions that I got.  I have read

11     all of the affidavits and declarations.  I have read through

12     Mr. Capeci's deposition.  I have looked at the exhibits at some

13     length.  So you can assume that I'm familiar with all that

14     stuff, and let's get on with the business at hand, which is to

15     cross-examine the witnesses and to complete the record and to

16     argue to me about why this motion should or should not be

17     granted.

18          Now, I gather we had two named plaintiffs.  And

19     Ms. Carrasco has admitted that she signed the arbitration

20     agreement.  So this hearing is really only about Ms. Gomez; is

21     that correct?

22          MR. ROTH:  Yes, your Honor.

23          THE COURT:  Okay.  Great.  Terrific.  So,

24     Ms. Predovan, Mr. Roth, the floor is yours.

25          MS. KINSLEY:  Your Honor, I apologize for the

1      interruption, but before we begin, I have a serious issue and a

2      motion to make before the Court.

3              THE COURT:  Yes.

4              MS. KINSLEY:  Yesterday at 3:23 p.m. when I was

5      attending a deposition here in New York City, I received three

6      e-mails from opposing counsel, Ms. Predovan, containing

7      Exhibits A through J, a table of contents which also referenced

8      three witness affidavits, and a letter to your Honor.

9              THE COURT:  Yes, I have that.

10             MS. KINSLEY:  All of that is content that I was not

11     provided and had not previously seen nor have been notified

12     about until yesterday.  So, basically, this is a situation

13     where I have been ambushed by my opponent's entire case.  The

14     Court's standing policies are clear in Section 5(g) of the

15     Court's individual practices and policies that the affidavits

16     and exhibits are to not only be submitted to the Court in

17     advance of the hearing but exchanged with opposing counsel, and

18     that was to happen last week.  Last week came and went with no

19     submissions being provided to me by plaintiffs' counsel.

20             THE COURT:  I got the point.  I got the point.

21             So what's going on here?

22             MS. KINSLEY:  So I'm --

23             THE COURT:  I know what you're doing.  You want me to

24     adjourn the hearing, which I'm not going to do.  But I may be

25     penalizing these people.

1                MS. PREDOVAN:  Your Honor, if I may.  First of all, I

2      believe that Rule G indicates that the exhibits were to be

3      exchanged and not the affidavits.  I actually have --

4                THE COURT:  On the contrary.  Everything.  Everything.

5      How is she supposed to cross-examine?

6                MS. PREDOVAN:  I had --

7                THE COURT:  We're going to sit here while she reads

8      the affidavits.  We're all going to sit here in the

9      courtroom -- you, your clients, me, sitting here on the bench

10     doing nothing, twiddling my thumbs, while she reads the

11     affidavits and works on her cross, because we're not adjourning

12     the hearing.

13               MS. PREDOVAN:  Your Honor, respectfully, I had a phone

14     conversation with Ms. Kinsley where she said she believed,

15     based on your order, indicating that Rule G doesn't apply in

16     these cases until you say so --

17               THE COURT:  Excuse me.  I don't believe what I'm

18     hearing.  At every trial or hearing in front of me where I ask

19     for affidavits, and I did, you're to exchange them, also the

20     exhibits.  You're to exchange them.  It's not a secret.  It's

21     the direct testimony.  She's supposed to cross-examine your

22     witnesses.  You're supposed to cross-examine her witnesses.

23     I've never heard anything so idiotic in my life.

24               MS. PREDOVAN:  In addition, your Honor --

25               THE COURT:  And if you were under any misapprehension,

F8IHGOMH                              Hearing

 1   a simple call to chambers would have cleared it up.

 2              MS. PREDOVAN:  If we had been able to open her

 3   affidavits, however, they were sealed when we tried to open

 4   them on ECF, it would have alerted us to our error.  I

 5   understand --

 6              THE COURT:  Why were they sealed?

 7              MS. PREDOVAN:  Your Honor, I don't know.

 8              THE COURT:  Do you know why they were sealed?

 9              MS. KINSLEY:  No, I filed them under the trial

10   documents docket and witness list and exhibit -- trial exhibits

11   and my -- I know my cocounsel, Mr. Silver, was able to open

12   them that way.

13              THE COURT:  And did anybody --

14              MS. KINSLEY:  No, I was not asked --

15              THE COURT:  Sarah, can you open them?

16              THE DEPUTY CLERK:  Yes.

17              THE COURT:  We can open them.  They're not filed under

18   seal.  They're not sealed.  They aren't sealed, because if they

19   were sealed, even we couldn't open them.  We'd have to go to

20   the clerk's office and get a copy.

21              MS. PREDOVAN:  Respectfully, your Honor, not only

22   myself but other attorneys at my office attempted to open

23   the --

24              THE COURT:  Fine.  You've got a problem with your

25   computer.

F8IHGOMH                       Hearing

1          MS. PREDOVAN:  And for that I apologize.

2          THE COURT:  Did you call?  Did you alert anybody?  I

3    came back to town to hold this hearing.  This is when the

4    hearing is going to be held.  But I'm telling you, we're going

5    to sit here and give her time.  I'm just going to sit here on

6    the bench.  You're going to sit here.  We'll all sit here in

7    silence, and you're going to give her time.

8          MS. PREDOVAN:  Your Honor, I would respectfully

9    request that we also receive a copy of her affidavits as well.

10   We're happy to remedy any error on our part.  And we do

11   apologize both to the Court and to --

12         THE COURT:  You don't have her affidavits because you

13   couldn't get into ECF?

14         MS. PREDOVAN:  That's correct.

15         THE COURT:  Sarah, would you give them a copy of the

16   affidavit.

17         Fine.  I'll tell you what we're going to do.  The

18   affidavits are here, but you're going to put your client on the

19   stand.  She's going to testify.  Okay.  We're going to listen

20   to direct.  We're going to listen to direct.  We're not going

21   to have lunch, folks.  We're going to be here all day until

22   we're done, and the hearing should have taken an hour and a

23   half.  Put your client on the stand.

24         MR. ROTH:  Your Honor, ultimately, as a partner in the

25   firm, it's my fault.  I apologize.  What I would suggest is

F8IHGOMH                          Hearing

1   that what happened was that --

2              THE COURT:  I don't care what happened.  I'm wasting

3   time.

4              MR. ROTH:  Okay.  So what I'm saying is I think that

5   if we read the affidavits, it will be five minutes, and then

6   you won't have to take -- everything I've done I've designed so

7   it would take you as little time as possible.  I've cut down --

8   I've pared down everything.

9              THE COURT:  I think I'm the only person in the room

10  who's read all the affidavits.

11             MR. ROTH:  That's true.

12             THE COURT:  Now, this might not be such a bad thing,

13  since I'm the one who's going to make the decision, but I think

14  I'm the only person in the room who's read all the affidavits.

15  Okay.

16             MR. ROTH:  What we're saying, if you give us ten

17  minutes --

18             THE COURT:  Read the affidavits.  They're not that

19  complicated.

20             (Recess)

21             THE COURT:  Okay.  Have we all read these very

22  complicated affidavits?

23             MR. ROTH:  Yes, your Honor.

24             MS. KINSLEY:  Your Honor, I have read the affidavits.

25  I did notice that one of them is from a handwriting expert, and

1   for purposes of preserving the record, I would like to move to

2   strike the handwriting expert's testimony.  The other two

3   witnesses are a different story.  I can read their affidavits

4   and comprehend them.  But I am certainly not a handwriting

5   expert, nor have I had an opportunity to consult with my own

6   expert to help me understand the testimony that the

7   plaintiffs' expert intends to present.  And for that reason, I

8   feel that I have been ambushed and prejudiced by submission of

9   that affidavit and, for the record, would move to strike his

10  testimony.

11          THE COURT:  Fine.  The motion is denied.  You read the

12  affidavit.  He doesn't testify much about handwriting.

13          Okay.  Call your first witness.

14          MR. ROTH:  Your Honor, I just have one point of order.

15  There's various witnesses in the courtroom.  Do you want them

16  to stay or to leave?

17          THE COURT:  Are you making a motion to exclude?  I

18  can't exclude a party.

19          MR. ROTH:  Right.  So --

20          THE COURT:  Are there any nonparty witnesses in the

21  room?

22          MR. ROTH:  Yes.  Ms. Picciochi, our handwriting

23  expert; technically, Mr. Barnes is also not a party.

24          THE COURT:  No, he's not a party.  Okay.  Anybody

25  who's not a party to the case should leave.  There's a witness

F8IHGOMH                        Carrasco - direct

1    room right outside that door and to the right.

2              Call your first witness.

3              MR. ROTH:  Okay.  Plaintiff calls Ms. Carrasco.

4              THE COURT:  Why are we calling Ms. Carrasco?  I

5    thought that she conceded that she signed --

6              MR. ROTH:  She has an affidavit that she's submitted,

7    declaration.  Basically, to authenticate her documents.

8              THE COURT:  Come on up, Ms. Carrasco.

9              THE DEPUTY CLERK:  You can step into the box.  Stay

10   standing and raise your right hand, please.

11    YASHIRA CARRASCO,

12        a plaintiff, called as a witness on her own behalf,

13        having been duly sworn, testified as follows:

14             MR. ROTH:  Your Honor, she has submitted a

15   declaration.  Pursuant to your rules, I don't know if you want

16   me to --

17             THE COURT:  What you should do is show it to her.

18   It's already been marked.  Show it to her and ask her if that's

19   her testimony.

20   DIRECT EXAMINATION

21   BY MR. ROTH:

22   Q.  Okay.  I'm showing you Plaintiffs' Exhibit 2-1 through 3.

23   Please take a look at that.

24             THE COURT:  Let's start with Plaintiffs' Exhibit 2.

25   Plaintiffs' Exhibit 2 is the affidavit; right?

F8IHGOMH                          Carrasco - direct

1             MR. ROTH:  The declaration, yes.

2             THE COURT:  Okay.  Ma'am -- says affirm.  Does she

3    have a copy of that of the affidavit?  Does she have a copy of

4    that?

5             MR. ROTH:  Who's "she"?

6             THE COURT:  Ma'am --

7             MR. ROTH:  Yes, she's holding on to it right now.

8             THE COURT:  -- there's an affidavit there.  Says

9    affidavit of Yashira Carrasco.

10            THE WITNESS:  Yes.

11            THE COURT:  Are you familiar with the contents of that

12   document?

13            THE WITNESS:  Yes.

14            THE COURT:  Is that your testimony?

15            THE WITNESS:  Yes.

16            THE COURT:  Okay.  Thank you.  Submitted.

17   BY MR. ROTH:

18   Q.  Ms. Carrasco, did you fill out an employment application

19   when you first began working at Lace?

20   A.  Yes.

21            THE COURT:  You don't get to --

22            MR. ROTH:  It's not part of the -- anything I'm asking

23   right now is not part of her affidavit.

24            THE COURT:  I know, but it should have been part of

25   her affidavit.

F8IHGOMH                         Carrasco - direct

1             MR. ROTH:  Your Honor, I didn't -- quite frankly.

2             THE COURT:  Never mind.  Go ahead.  Just go ahead.  It

3    will be faster if you just ask.

4             MR. ROTH:  Okay.

5             THE COURT:  Let me ask you a question.  The lady says

6    in her affidavit she affirms under oath that she signed an

7    arbitration agreement.  Are you, nonetheless, pressing her

8    claim that she is not required to arbitrate?

9             MR. ROTH:  No, your Honor.

10            THE COURT:  In that case, she has no relevant

11   testimony.

12            MR. ROTH:  It's relevant because unless you'll accept

13   the documents as authenticated because her signature's on here,

14   her signature's on there, there's various documents that are

15   going to come into question by the document examiner, and I

16   need her sworn testimony to authenticate these documents.

17            THE COURT:  Document examiner's not going to be

18   allowed to testify about her document because --

19            MR. ROTH:  It's a comparison between her document and

20   the other documents that are important to this case, your

21   Honor.

22            THE COURT:  I doubt it very much.

23            MR. ROTH:  I promise.

24            THE COURT:  I doubt it very much.

25            MR. ROTH:  It's going to take two minutes.

F8IHGOMH                     Carrasco - direct

 1              THE COURT:  Two minutes.

 2   BY MR. ROTH:

 3   Q.  I want to show you what's Plaintiffs' Exhibit B-3 and 4.

 4   Could you please take a look at.  Please tell me what that is.

 5   A.  This is the application.

 6   Q.  Is that your handwriting on there?

 7   A.  Yes.

 8   Q.  Is that your signature?

 9   A.  Yes.

10   Q.  Did you fill it out?

11   A.  Yes.

12   Q.  At your initial employment, were you given that document?

13   Is that how you got your employment?

14   A.  Yes.

15              MR. ROTH:  Your Honor, I move to have that admitted

16   into evidence.

17              THE COURT:  Admitted.

18              MR. ROTH:  Okay.  Thank you.

19              (Plaintiffs' Exhibits B-3 and B-4 received in

20   evidence)

21   BY MR. ROTH:

22   Q.  I'm going to what's been marked as Plaintiffs' B-1 and B-2.

23   Take a look at.  At some point in time after your initial

24   employment, were you asked to sign additional documents?

25   A.  Yes.

F8IHGOMH                              Carrasco - direct

1   Q.   Okay.  Is that the document that you were asked to sign in

2   your hand?

3   A.   Yes.

4   Q.   Looking at this second page of that document, is that

5   document -- is that your handwriting on there and your

6   signature?

7   A.   Yes.

8   Q.   Underneath your name, whose handwriting is that?

9   A.   Mine.

10          MR. ROTH:  I move to admit that into evidence.

11          THE COURT:  You offer it.  You offer it.

12          MR. ROTH:  I offer it into evidence.

13          THE COURT:  It's admitted.

14          (Plaintiffs' Exhibits B-1 and B-2 received in

15   evidence)

16   BY MR. ROTH:

17   Q.   Who gave you that agreement?

18   A.   My manager.

19   Q.   What was your manager's name?

20   A.   Phil.

21   Q.   Okay.  Before did you see a man here who was also a manager

22   there?

23   A.   No.

24   Q.   Did you notice him?  Where's the manager's office in Lace?

25   A.   Downstairs.

F8IHGOMH                          Carrasco - cross

1    Q.  Okay.  In the seven months you worked there, how often

2    would you go into the manager's office?

3    A.  A lot.

4    Q.  When you went down there, was there a manager in there?

5    A.  Yes.

6    Q.  Did you fit in that manager's office with the other

7    manager?

8    A.  Yes.

9    Q.  So just tell me the configuration, where would the manager

10   be, where would you be?

11   A.  He'd be on the chair.  I'd be standing next to the table.

12           MR. ROTH:  Okay.  That's it.  Thank you, your Honor.

13           Oh, wait, you know what, I have one -- one other

14   question.  Nope.  No, I don't.  Thank you.

15           THE COURT:  Ma'am.

16   CROSS-EXAMINATION

17   BY MS. KINSLEY:

18   Q.  Ms. Carrasco, this may seem like a very obvious question

19   for you, but you are not Jacqueline Gomez, are you?

20   A.  No.

21   Q.  You did not sign Jacqueline Gomez's arbitration agreement,

22   did you?

23   A.  No.

24           MS. KINSLEY:  I have no further questions.

25           THE COURT:  Thank you, ma'am, you can go home.

F8IHGOMH                         Gomez – direct

1                THE WITNESS:  Thank you.

2                (Witness accused)

3                MR. ROTH:  Leave them up there.

4                Call my next witness.  Jacqueline Gomez.

5                THE DEPUTY CLERK:  You can come up.  When you get into

6      the box, just stay standing for a minute and raise your right

7      hand.

8       JACQUELINE GOMEZ,

9           a plaintiff, called as a witness on her own behalf,

10          having been duly sworn, testified as follows:

11               MR. ROTH:  Your Honor, I'm going to show the witness

12     her affidavit that she submitted.

13               THE COURT:  That's Plaintiffs' Exhibit 1, I believe.

14               MR. ROTH:  Plaintiffs' Exhibit 1.

15     DIRECT EXAMINATION

16     BY MR. ROTH:

17     Q.  Could you take a look at it, please.

18               Have you read the contents of that?

19     A.  Yes.

20     Q.  Is that true and accurate and is that your statement in

21     that testimony in this case?

22     A.  Yes.

23               MR. ROTH:  Okay.  I move -- submit.

24               THE COURT:  "Offer" is the word.  The verb is offer.

25               MR. ROTH:  I offer it into evidence.

F8IHGOMH                          Gomez - direct

1              THE COURT:  It's admitted.

2              (Plaintiffs' Exhibit 1 received in evidence)

3              THE COURT:  I have read it.

4    BY MR. ROTH:

5    Q.  Now, I'm going to ask you, when did you start working at

6    Lace, approximately?

7    A.  May 2014.

8    Q.  What was your position?

9    A.  Waitress.

10   Q.  When you first got there, did you have to fill out some

11   paperwork?

12   A.  Correct.

13   Q.  I'm going to show you what's been marked as A-3 and 4,

14   application for employment.  I want to show you that.

15             MS. KINSLEY:  Your Honor, I have not been provided

16   copies of the exhibits that are attached to this affidavit.

17             THE COURT:  I don't understand.  You said you got the

18   exhibits yesterday.

19             MS. KINSLEY:  That --

20             THE COURT:  Here.  Why don't you just take my copies.

21             MS. PREDOVAN:  If I could correct something, your

22   Honor.  It's not an exhibit.  It's page 2 and 4 of what is

23   premarked as Plaintiffs' Exhibit A.  Our apologies for any

24   confusion.

25             MR. ROTH:  You should have it.

F8IHGOMH                        Gomez - direct

1              MS. KINSLEY:  Exhibit A?

2              MR. ROTH:  It's her employment application that you

3   gave us.

4              MS. PREDOVAN:  Counsel misspoke when he said that it

5   was A.

6              THE COURT:  Fine, fine, fine.

7              MS. KINSLEY:  I've located it, your Honor.  Thank you.

8   BY MR. ROTH:

9   Q.  Okay.  Did you fill out this document?

10  A.  Yes.

11  Q.  Whose handwriting's on it?

12  A.  Mine.

13  Q.  Who filled it out?

14  A.  I did.

15  Q.  Whose signature?

16  A.  Mine.

17  Q.  And the printing, the printing part of it, who did that?

18  A.  I did.

19             MR. ROTH:  I offer that into evidence.

20             THE COURT:  It's admitted.

21             (Plaintiffs' Exhibits A-2 and A-3 received in

22  evidence)

23  BY MR. ROTH:

24  Q.  What was your position when you worked at Lace?

25  A.  Waitress.

F8IHGOMH                          Gomez - direct

1   Q.  How many days a week did you work there in September 2014?

2   A.  One.

3   Q.  How did you become aware that Lace started having employees

4   sign arbitration agreements?

5   A.  Yashira told me.

6           I'm sorry.  What was your question?

7   Q.  I said how did you become aware that Lace started having

8   employees sign arbitration agreements?

9   A.  Yashira told me.

10  Q.  Okay.  When for the first time were you approached and

11  asked to sign an arbitration agreement?

12  A.  October 3.

13  Q.  What happened on October 3?

14          MS. KINSLEY:  Your Honor, I object to that testimony.

15  It was not provided in the witness statement.

16          THE COURT:  Oh, sit down.

17          Answer the question, ma'am.

18          THE WITNESS:  I'm sorry.  What was your question?

19          THE COURT:  What happened on October 3?

20          THE WITNESS:  I went in to go pick up my check.  I had

21  surgery that morning, and I went to pick up my check.  And then

22  Mario said, You have to sign this paper.  And I said, What's

23  that?  And he said, It's arbitration.  It's --

24          THE COURT:  Slow down a little bit.  This poor lady,

25  she's trying to take down everything you say.

1          THE WITNESS:  I'm so sorry.

2          THE COURT:  I know you're nervous.  I've actually done

3    what you're doing, so slow down.

4          THE WITNESS:  Okay.  So he said it was an arbitration

5    agreement, somewhat illegal.  So I said, I don't have time for

6    that right now.  I took my check and I took the paper, and I

7    just left.

8    BY MR. ROTH:

9    Q.  Okay.  Now, what happened to the arbitration agreement that

10   he gave you?

11   A.  I have no idea.  I didn't do anything with it because I

12   didn't work to work no time after soon after.

13   Q.  I'm going to showing you what's marked as Plaintiffs'

14   Exhibit A-1 and A-2.  Take a look at that.  When had you seen

15   this agreement filled out for the first time?

16   A.  When I went to my lawyer's office.

17   Q.  When you came to my office?

18   A.  Correct.

19   Q.  On that document, looking at the second page, did you sign

20   that?

21   A.  Not at all.

22   Q.  Okay.  How do you know that you didn't sign that?

23   A.  For starters, my name is misspelled.  And when my name is

24   misspelled, I correct it automatically.  My dates are wrong.  I

25   never write my dates like this.  It's not my handwriting at

F8IHGOMH                    Gomez - direct

1    all.  My signature's pretty simple, but it's not my signature

2    at all.

3    Q.  Okay.  Now, on the 27th, where were you?

4    A.  I was at a birthday party with my daughter and her friend.

5    Q.  Let me show you what's been marked as Plaintiffs' Exhibit s

6    J-1 and J-2.  Can you tell me what that document is.

7    A.  It's a blank arbitration agreement.

8    Q.  All right.  When did you get that agreement?

9    A.  In January.

10   Q.  Of what year?

11          THE COURT:  I don't have this.

12          MR. ROTH:  J-1 and J-2?

13          THE COURT:  I don't have this.

14          MS. PREDOVAN:  Your Honor, this was hand-delivered to

15   your chambers yesterday.  We at first had the opportunity to

16   examine the original documents --

17          THE COURT:  All I said was I don't have it.  Where's

18   my copy?

19          MS. PREDOVAN:  Your Honor, I'll happily provide you

20   one.

21          THE COURT:  This is J-2 also.

22   BY MR. ROTH:

23   Q.  Where did this come from?

24   A.  It was sent to me.

25   Q.  Okay.

F8IHGOMH                          Gomez - cross

<table>
<tr><td>1</td><td>THE COURT:  It was what?</td></tr>
<tr><td>2</td><td>THE WITNESS:  Sent over to me.</td></tr>
<tr><td>3</td><td>THE COURT:  It was sent over to you?</td></tr>
<tr><td>4</td><td>THE WITNESS:  Yes.</td></tr>
</table>

1        THE COURT:  It was what?

2        THE WITNESS:  Sent over to me.

3        THE COURT:  It was sent over to you?

4        THE WITNESS:  Yes.

5   BY MR. ROTH:

6   Q.  What month was that?

7   A.  January 2015.

8   Q.  Generally, when you got paid by Lace was that by check or

9   some other means?

10  A.  It was by check.

11  Q.  And would you endorse your signature on the back of those

12  checks?

13  A.  Correct.

14       MR. ROTH:  Okay.  Your Honor, no further questions.

15       THE COURT:  Okay.  Cross.

16  CROSS-EXAMINATION

17  BY MS. KINSLEY:

18  Q.  Ms. Gomez, you previously worked at the Penthouse Club on

19  45th Street; is that correct?

20  A.  Correct.

21  Q.  Were you required to sign an arbitration agreement at that

22  establishment?

23  A.  No.

24  Q.  You continued to work as an employee of MLB Enterprises

25  until January of this year; is that right?

F8IHGOMH                        Gomez - cross

1    A.  Correct.

2    Q.  Were you ever advised that it was a corporate policy that

3    you could not continue to work if you had not signed an

4    arbitration agreement?

5    A.  No.

6              THE COURT:  You need to wait till she's done with the

7    question before you answer.

8    Q.  I'd like to ask you to pick up the signed arbitration

9    agreement that is in front of you.  I believe it's Exhibit A to

10   your affidavit.  Do you see that?

11   A.  Yes.

12   Q.  You have identified the print underneath your signature as

13   not yours; is that right?

14   A.  Correct.

15   Q.  You have no knowledge of when that print was placed on that

16   document, do you?

17   A.  No.

18   Q.  You've made some assertions that you would have corrected

19   it if it was there when you signed it; is that right?

20   A.  I never signed the document.

21   Q.  You've made an assertion.  I asked you if you've made an

22   assertion.

23             THE COURT:  You did say you would have corrected it --

24             THE WITNESS:  Correct.

25             THE COURT:  -- if you had seen it?

1              THE WITNESS:  Correct.  Sorry.

2      BY MS. KINSLEY:

3      Q.  If it had not been there when you signed it, you could not

4      have corrected it; right?

5              THE COURT:  I think you should use the word "see"

6      instead of "saw" because the lady says she never signed the

7      agreement.  Now, I get to decide whether she did or she didn't.

8      But for the purpose of cross-examining, it will go more

9      fruitfully if you talk about when she saw the document.

10             If you would have seen this, you would have corrected

11     it?

12             THE WITNESS:  Correct.

13             THE COURT:  Are you telling me you didn't see this?

14             THE WITNESS:  No, I never signed the document.  When I

15     saw this is when I went to my attorney.

16             THE COURT:  When you saw this is when you went to your

17     attorney?

18             THE WITNESS:  Correct.

19             MS. KINSLEY:  I have no further questions, your Honor.

20             THE COURT:  Okay.

21             MR. ROTH:  One redirect.

22     REDIRECT EXAMINATION

23     BY MR. ROTH:

24     Q.  The part you said you would correct and cross out would be

25     what?

F8IHGOMH                         Picciochi - direct

1   A.  Would be my name.

2   Q.  What's wrong with your name on that document?

3   A.  It's misspelled.  It's J-a-c-q-u-e-l-i-n-e, and it's

4   missing the "E."

5               MR. ROTH:  Okay.  No further questions.

6               THE COURT:  Okay.  Thank you.  Do you want these two

7   pieces of paper in evidence, J-1 and J-2?

8               MR. ROTH:  Oh, yes, your Honor.

9               THE COURT:  Fine.  They are.

10              (Plaintiffs' Exhibits J-1 and J-2 received in

11  evidence)

12              MR. ROTH:  I call as my next witness Mr. Picciochi.

13              THE COURT:  Okay.

14              MR. ROTH:  I've got to get him.  Sorry.  Your Honor,

15  I'm going to use blowups with him.  I just made blowups of the

16  documents.

17              THE COURT:  Just get the witness.

18              MR. ROTH:  Okay.

19   RICHARD PICCIOCHI,

20       called as a witness by the Plaintiffs,

21       having been duly sworn, testified as follows:

22  DIRECT EXAMINATION

23  BY MR. ROTH:

24  Q.  All right.  I'm going to show you your declaration.

25  Plaintiffs' Exhibit 3, take a look at that.

1          You familiar with that document?

2     A.  Yes, sir.

3     Q.  Is everything in there true and accurate, and do you adopt

4     it as your testimony in this case?

5     A.  Yes.

6              MR. ROTH:  I offer that.

7              THE COURT:  It's admitted.

8              (Plaintiffs' Exhibit 3 received in evidence)

9     BY MR. ROTH:

10    Q.  Mr. Picciochi, I'm going to also show you your CV,

11    Plaintiffs' Exhibit E.  Take a look at that.

12             Is that your CV containing all of your professional

13    qualifications?

14    A.  Yes, sir.

15             MR. ROTH:  Okay.  I offer that.

16             THE COURT:  It's admitted.

17             (Plaintiffs' Exhibit E received in evidence)

18    BY MR. ROTH:

19    Q.  Okay.  Can you explain your profession, Mr. Picciochi.

20    A.  I'm a questioned document examiner, also known as a

21    forensic document examiner.

22    Q.  And what is that?

23    A.  A questioned document examiner is one who examines

24    handwriting and anything on a document that may be in question.

25    Q.  By whom are you currently employed?

1    A.  I am currently self-employed.

2    Q.  Before you were self-employed, for whom were you employed?

3    A.  I was employed by New York City Police Department as a

4    questioned document examiner for approximately 20 years in

5    crime laboratory's questioned document section as a detective

6    and technical supervisor of the questioned document unit.

7    Q.  Have you received any specialized training to become a

8    questioned document examiner?

9    A.  Yes, sir.

10   Q.  What was that?

11   A.  I have received three years of apprenticeship training from

12   the New York City Police Department, from the Federal Bureau of

13   Investigation, and the United States Secret Service.  The

14   training included formal lectures, practical exercises, written

15   tests and oral presentations.  I supplemented that training by

16   attending workshops and symposia and studied under private

17   document examiners while also taking college courses in

18   handwriting and document examinations.

19   Q.  How much of your time now is devoted to the study and

20   examination of such matters?

21   A.  That is my full-time career.

22   Q.  How many documents have you examined over the course of

23   your career?

24   A.  Thousands and thousands of documents.

25   Q.  Do you teach any courses in forensic document examining?

F8IHGOMH                          Picciochi - direct

1   A.   Yes, I have taught at CUNY at a City University of New York

2   John Jay College of Criminal Justice, and more recently, at

3   Hofstra University in Long Island in their forensic science

4   department.

5   Q.   Has any court ever disqualified you when you've been

6   attempted to be admitted as an expert?

7   A.   I've qualified each and every time.

8            MR. ROTH:  Your Honor, I offer Mr. Picciochi as an

9   expert.

10           MS. KINSLEY:  No objection, your Honor.

11           THE COURT:  Any voir dire?

12           MS. KINSLEY:  -- subject to my prior objection.

13           THE COURT:  I understand.

14  BY MR. ROTH:

15  Q.   Okay.  Mr. Picciochi, in those cases where you had an

16  original questioned document and had an original exemplar

17  document and you were asked to determine the genuineness of an

18  original document, were you ever unable to offer an opinion

19  either way?

20  A.   Document or handwriting or both?

21  Q.   Document.

22  A.   Generally, when you have standards, then I can make a

23  comparison and reach an opinion.

24  Q.   In this matter were you given an assignment?

25  A.   Yes, sir.

1   Q.   What was your assignment?

2   A.   To examine the signature on an arbitration document for

3   Jacqueline Gomez and also to look at the document itself and

4   determine if it was genuine or spurious in nature.

5   Q.   Okay.  Did you have anything to compare it with?

6   A.   Yes, I did.

7   Q.   What was that?

8   A.   I had numerous exemplars of Ms. Gomez's signature, and I

9   also had Ms. Carrasco's arbitration agreement to do a

10  comparison of the documents.

11  Q.   I'm going to show -- when you were asked for this

12  assignment, what's the first thing you did?

13  A.   I looked at the sufficiency of the materials that were

14  provided.

15  Q.   What was the first thing that you requested?

16  A.   I requested access to the original questioned document.

17  Q.   What did you come to learn?

18  A.   That it was unavailable.

19  Q.   That the original -- that the original of the Gomez

20  arbitration agreement was unavailable?

21  A.   That is correct.

22  Q.   What was the next thing you did to analyze the documents?

23  A.   I studied the features within the questioned signature to

24  determine if there was sufficient characteristics to reach a

25  conclusion.

F8IHGOMH                    Picciochi - direct

1   Q.  As far as the signatures went, what were you able to

2   conclude about the signature on the copy?

3   A.  That the signature was reproduced with very low resolution

4   and that it lacks much detail necessary for a complete

5   examination; that is, there are no letter forms, no letter

6   designs or formations, there are no relationships between

7   letters, and I was not able to look at the movement

8   characteristics in the signature from the copy.

9   Q.  How were you inhibited from doing a complete and full

10  analysis by not having the original?

11  A.  Having the original, I would be able to look at the most

12  important characteristics in a signature, which is how it is

13  formed; how the pen moved through space and time, that is,

14  pressure, pressure variation, speed, tremor, lack of tremor,

15  flying starts and stops in the signature.  So these

16  characteristics were skewered, which is a severe limitation to

17  the analysis.

18  Q.  The issue with her signature is, just generally, in lay

19  terms, it's just too easy to duplicate; is that fair to say?

20  A.  It is definitely an illegible and very simple signature and

21  can readily be simulated or imitated.

22  Q.  Okay.  I'm going to show you -- your Honor, I made blowups

23  for demonstrative purposes.  Is that all right if we use them?

24          THE COURT:  Sure.

25  Q.  Okay.  So I'm going to show you two blowups.  Have you seen

F8IHGOMH                      Picciochi - direct

1   these blowups before, these two blowups?

2   A.  I have not.

3   Q.  Okay.  Have you seen the documents that these came from?

4   A.  Yes, sir.

5   Q.  Okay.  Would it be fair to say one of these is the

6   purported Gomez arbitration agreement and the other one is the

7   Carrasco arbitration agreement; is that correct?

8   A.  That is correct, sir.

9   Q.  Okay.  Just looking at the Gomez arbitration, what could

10  you tell about that document by itself in comparison to other

11  exemplars of Ms. Gomez?

12  A.  In terms of signature?

13  Q.  The signature and the handwriting.

14  A.  That there is a signature that is not complex.  And if you

15  look closely at it, especially under stereomicroscope with

16  various lighting, you would notice that it is distorted and

17  digitized, much like pixilation.  So the line quality of the

18  signature is obscured so I cannot see how it was made, no

19  indication of speed and naturalness in the person's writing.

20  Q.  Now, looking -- I'm sorry.  The document's up there -- at

21  Plaintiffs' Exhibit A-3 and A-4, this is the Gomez employment

22  application, have you seen that document before?

23  A.  I have, sir.

24  Q.  Okay.  What can you tell from looking at that employment

25  application, as well as -- I know you've seen other

1    documents –– and the handwriting underneath the signature on

2    this document?

3    A.  The hand printed name, Jacqueline Gomez, on the questioned

4    document is missing one letter, the letter "E" in Jacqueline

5    before the "L"; that is, "E" is present in the application.  So

6    the spelling of the name is different.

7    Q.  Now, even though this is a copy, are you able to tell from

8    looking at the hand printing how –– if it's similar or

9    different from Ms. Gomez?

10   A.  I am because the hand printing is much more complex and

11   contains recognizable letter forms and therefore proportions,

12   height, spacing, and other characteristics that I can use for

13   comparison.

14   Q.  Can you offer an opinion as to whether that is her

15   handwriting?

16   A.  It is not consistent with the known writings; and,

17   therefore, it's my expert opinion that the hand printing below

18   the questioned signature is not that of Ms. Gomez.

19   Q.  What about the date?  What's the difference between the way

20   the date's written there and the date that you have seen her

21   write on other documents?

22   A.  Ms. Gomez, in her known writings, always uses slashes

23   between the numbers in the dates.  The questioned document has

24   dots and not slashes.

25   Q.  Okay.  Now I'm going to hold the blowup.  Hopefully, it

F8IHGOMH                          Picciochi - direct

1   won't fall down.

2              THE COURT:  I can't find her employment application.

3   I had it.  I wrote on it.

4              MR. ROTH:  We have extras.

5              THE WITNESS:  Do you want my copy?

6              THE COURT:  I want my copy because I have notes on it.

7              MR. ROTH:  I have an extra, your Honor.

8              THE COURT:  No, no.  It's here.  It's behind Exhibit

9   A.  I was looking at it separately.

10             MR. ROTH:  I apologize.

11             THE COURT:  All right.  Thank you.

12  BY MR. ROTH:

13  Q.  Now, looking at the signature page on the Carrasco

14  arbitration agreement, which she did admit to signing, can you

15  tell any differences between the Carrasco arbitration agreement

16  and the agreement that Jacqueline Gomez purportedly signed?

17  A.  Yes.  The printed matter on both documents are -- is

18  somewhat different.  In particular, if you look on the right

19  side of both forms, the MLB -- I can't quite read.

20  Q.  MLB?

21  A.  Yes, MLB line is in brackets.

22  Q.  So here it's in brackets?

23             THE COURT:  I can see that.

24             THE WITNESS:  Correct.

25             THE COURT:  I don't need a questioned documents expert

1   to tell me that.

2   BY MR. ROTH:

3   Q.  Okay.  So, obviously, there's a whole bunch of other

4   differences between these two documents, and I agree with your

5   Honor that I'm not going to go through them all.  But what

6   about these two documents is significant that it would take a

7   questioned document examiner to notice?

8   A.  The signature of Capeci and the printed name, his title,

9   and the date are virtually identical.  And due to natural

10  variation within a person's writing, we are not machines, it is

11  unlikely that a person can write virtually the same each and

12  every time.  They can basically be superimposed with each

13  other.

14  Q.  So you're saying that the two signatures by Capeci, that

15  they don't have a natural variation that you would find in

16  anybody's handwriting?

17  A.  Most people's writings have some sort of variation, yes.

18  Q.  Now, we've previously provided you with Plaintiffs'

19  Exhibit F, which was a licensing agreement.  I'm going to show

20  you that.  And the last page, which we're going to be looking

21  at, is F-5.

22       Have you seen this document before?  And look at the

23  signature page on that document that's F-5.

24  A.  Yes, I have seen this document before.

25  Q.  Okay.  Is Mr. Capeci's signature on that document, F-5?

F8IHGOMH                           Picciochi - direct

1   A.  It is, along with the printing.

2   Q.  Okay.  When you're looking at the signature on that, can

3   you describe what natural variation is there?  Is there a

4   natural variation between that signature and the signature you

5   see on either of these two arbitration agreements?

6   A.  Yes.  The signature and the hand printing are not identical

7   to the signature and printing on both the Carrasco and Gomez

8   signatures.

9   Q.  But they're close enough that you as a -- as somebody who

10  can analyze handwriting can say that it is his signature on

11  both?

12  A.  Yes.

13  Q.  On the F-5 that you're looking at as well as these two

14  documents; is that correct?

15  A.  That is correct, sir.

16  Q.  Other than what you've already described, in what other way

17  were the plaintiffs unable to -- what other analysis was not

18  available to the plaintiffs that would have been relevant here

19  that you could have recommended to us had we had an original?

20  A.  Two major examinations, the examination of the paper itself

21  and the examination of the inks for relative and absolute

22  dating.

23  Q.  Okay.  What is the ink?  What is that?

24  A.  Well, first of all, from a copy I cannot even tell how that

25  signature was applied, whether a writing instrument, is it

F8IHGOMH                    Picciochi - direct

1   toner, is it transferred, is there embossing, what type of

2   writing instrument it might be.  I cannot tell if there are any

3   guidelines.  I cannot tell anything from the paper itself.  If

4   it had the same fluorescence, same physical qualities in terms

5   of tint or thickness.  And in terms of the ink, since they are

6   two contemporaneous forms, both appear to be signed the same

7   date, 9/27/2004 --

8   Q.   '14.

9   A.   -- not myself, but an ink chemist, can do a relative ink

10  dating to see if they are consistent with being prepared at the

11  same time.

12  Q.   So just to sum up, as a professional document examiner, as

13  far as the Gomez arbitration agreement goes, knowing that

14  Ms. Carrasco admitted to making the signature, what questions

15  would you have for those that have remained unanswered at this

16  time?

17  A.   Basically, I'd like to see the original of the questioned

18  Gomez so I can compare or have available an ink chemist to do a

19  comparison, but I can also do an examination of the paper

20  itself.

21  Q.   But you would agree, without question, that because the

22  signatures on both documents are so similar that that raises

23  questions about the genuineness of the Gomez arbitration?

24          MS. KINSLEY:  Objection.  Leading.

25          THE COURT:  The objection is sustained.

F8IHGOMH                        Picciochi - cross

1              MR. ROTH:  Okay.  No further questions, your Honor.

2              THE COURT:  If you'd like to testify, I'd be happy to

3       swear you.

4              MR. ROTH:  No further questions, your Honor.

5              THE COURT:  Cross.

6              MS. KINSLEY:  Your Honor, just so the record's clear,

7       I want to proffer two actions I would have taken had I known

8       about Mr. Picciochi's -- I hope I'm pronouncing that right --

9       testimony prior to this morning.  I would have sought the

10      assistance of my own questioned exam -- questioned document

11      examiner, and I also would have requested handwriting exemplars

12      of Ms. Gomez that Mr. Picciochi referenced in his testimony.

13             THE COURT:  Let's find out what they are.

14      CROSS-EXAMINATION

15      BY MS. KINSLEY:

16      Q.  Let's start there, Mr. Picciochi.  You referenced that you

17      had numerous exemplars of Ms. Gomez's handwriting.  Can you

18      state the origin of each of those exemplars and when you

19      acquired it.

20             THE COURT:  They have to be shown.  In case you aren't

21      familiar with the rules, when an expert testifies and says he

22      relied on something, your opponent has to have copies of

23      everything.  That's why you see doctors come in with large

24      piles of textbooks in medical malpractice cases, because this

25      information has to be available for cross-examination.

F8IHGOMH                    Picciochi - cross

1          So why don't you hand me all the known exemplars.  I

2     haven't seen anything.

3          MR. ROTH:  Basically, the our retainer agreement and

4     consent.

5          THE COURT:  This is it?

6          MR. ROTH:  No, this is not it, your Honor.  Those are

7     the only originals that we had because she didn't have -- she

8     didn't have other originals.  But as far as the --

9          THE COURT:  Sir, show me everything you looked at.

10         THE WITNESS:  I have my own set of copies.

11         THE COURT:  Fine.  Here.  Here.  Please give these to

12    her.  Give these to her.  And we'll take time.  I mean, I

13    really loathe having to teach evidence to lawyers who are

14    supposed to know what they're doing, but it's Evidence 101 that

15    when you have an expert witness, every document, article,

16    whatever that's the basis of his opinion, is to be tendered to

17    the other side.  I'll probably end up striking his testimony,

18    not that I think it was particularly necessary.

19         (Pause)

20         MS. KINSLEY:  Your Honor, may I mark these as

21    Defendants' Exhibit F?

22         THE COURT:  You may.  We'll make copies later.

23         MS. KINSLEY:  May I approach the witness?

24         THE COURT:  You may.

25    BY MS. KINSLEY:

F8IHGOMH                    Picciochi - cross

1   Q.  Mr. Picciochi, I'm showing you what we will mark for the

2   record as Defendants' Exhibit F.  Would you take a moment and

3   look through those documents.

4           MR. ROTH:  Your Honor, just to the extent that there's

5   any personal identifying information, if we could redact that

6   if that's going to be an issue?

7           THE COURT:  I don't know that it's going to be an

8   issue.

9   Q.  Do you recognize Defendants' Exhibit F?

10  A.  Yes.

11  Q.  Have you had a chance to review it?

12  A.  Yes.

13  Q.  I'd like to ask you some specific questions about the

14  documents in Defendants' Exhibit F.  Do you see the top page

15  which has two lines of typed writing, a line that says

16  "accepted and agreed," a line that says "client," and then some

17  handwriting?

18  A.  Yes.

19  Q.  Would you agree with me that the signature contained on the

20  line "client" is an original?

21  A.  Yes, ma'am.

22  Q.  Looking at page 2 of Defendants' Exhibit F, the top of this

23  page says, "Consent to become a party plaintiff."  Do you see

24  that?

25  A.  Yes, ma'am.

1   Q.   Then there's a paragraph of typed writing.  Do you see

2   that?

3   A.   Yes, ma'am.

4   Q.   Then there's a blank line that says "signature" and a

5   signature on that line.  Do you see that?

6   A.   Yes, ma'am.

7   Q.   Would you agree with me that that signature is an original?

8   A.   Correct.

9   Q.   So the record's clear, we're referencing page 2 of Exhibit

10  F?

11  A.   Correct.

12  Q.   Then we have a stack of what I would characterize as

13  personal documents, apartment leases, credit card agreements,

14  medical records, etc.  Are you familiar with these documents?

15  A.   Yes, ma'am.

16  Q.   Do these documents purport to contain Jacqueline Gomez's

17  signature in some form?

18  A.   Yes, they were submitted as known writings by her.

19  Q.   Would you agree with me that each of the signatures on the

20  remaining documents in Defendants' Exhibit F, not pages 1 and

21  2, are copies?

22  A.   That is correct.

23  Q.   Do the documents in Defendants' Exhibit F comprise the

24  entirety of the handwriting exemplars that you compared

25  Jacqueline Gomez's signature to?

F8IHGOMH                        Picciochi - cross

1   A.  They are all the samples that I have, yes.

2   Q.  Now, you indicated, I believe, that you were unable to

3   reach any conclusions or opinions about the authenticity of

4   Ms. Gomez's signature on the arbitration agreement; is that

5   correct?

6   A.  That is correct.

7   Q.  You did opine about the printing underneath Ms. Gomez's

8   signature on that document.  Do you recall doing that?

9   A.  I do.

10  Q.  And your opinion about the print handwriting is different

11  from your opinion about the signature; correct?

12          THE COURT:  He didn't have an opinion about the

13  signature.

14  Q.  The opinion that you reached about the print handwriting --

15          THE COURT:  You reached an opinion about the print; is

16  that correct?

17          THE WITNESS:  Yes.  Yes, ma'am.

18          THE COURT:  And the fact that you reached an opinion

19  is different from the fact that you didn't reach an opinion

20  about the signature; is that correct?

21          THE WITNESS:  Yes.

22  BY MS. KINSLEY:

23  Q.  This ink test you mentioned, you did not perform that;

24  right?

25  A.  No, I'm not an ink chemist, and an ink analysis cannot be

F8IHGOMH                          Picciochi - cross

1   performed on toner.

2   Q.  And a chemist did not perform that test either; right?

3   A.  That is correct.

4   Q.  You also mentioned that the resolution was very low on

5   Ms. Gomez's signature on the arbitration agreement; right?

6   A.  Yes, ma'am.

7   Q.  Were you aware that that document came from a PDF document?

8   A.  No, I am not aware.

9   Q.  Do you know in what way it came to be printed out on the

10  piece of paper that you saw?  And I'm referencing Jacqueline

11  Gomez's arbitration agreement.

12  A.  Well, when it was sent to me by e-mail attachment, yes, it

13  was a PDF.

14  Q.  Scanners vary in the amount of resolution that they use to

15  create a PDF document; isn't that right?

16  A.  They can.

17  Q.  And computers vary in the way that they create PDF

18  documents in different resolutions; right?

19  A.  Not so much the computer, but the printout device.

20          THE COURT:  The printer?

21          THE WITNESS:  Yes, ma'am.

22          MS. KINSLEY:  I have no further questions, your Honor.

23          THE COURT:  Thank you so much for coming.

24          THE WITNESS:  Thank you.

25          (Witness excused)

F8IHGOMH                          Barnes - direct

 1            MS. KINSLEY:  Your Honor, I would offer Defendants'

 2   Exhibit F, and I apologize and do not have an exhibit sticker.

 3            THE COURT:  Don't worry about that.  We can put an

 4   exhibit sticker on it.  We'll have to make a copy of it.  And

 5   yes, it's admitted.

 6            (Defendants' Exhibit F received in evidence)

 7            THE COURT:  That's your evidence; right?

 8            MR. ROTH:  Yes, your Honor.

 9            MS. KINSLEY:  Your Honor, I call Mario Barnes.  He's

10   in the witness room.  May I get him?

11            THE COURT:  Of course you may.

12            Good morning, Mr. Barnes.  Won't you come up here,

13   sir.

14    MARIO BARNES,

15        called as a witness by the Defendants,

16        having been duly sworn, testified as follows:

17            THE COURT:  Mr. Barnes, do me a favor.  Lift up that

18   microphone just a little bit.  Thank you so much, sir.

19            MS. KINSLEY:  Your Honor, may I approach the witness?

20            THE COURT:  You may.

21   DIRECT EXAMINATION

22   BY MS. KINSLEY:

23   Q.  Mr. Barnes, I'm showing you what I've marked as Defendants'

24   Exhibit D.  Do you recognize that document?

25   A.  Yes, I do.

F8IHGOMH                              Barnes – direct

1    Q.   Is that a declaration that you signed for the purposes of

2    the hearing today?

3    A.   Yes, it is.

4    Q.   Does that contain your true and correct testimony?

5    A.   Yes.

6    Q.   I'm now showing you what I've marked as Defendants' Exhibit

7    A.   Do you recognize that document?

8    A.   Yes, I do.

9    Q.   Is that the checklist that you referenced in your

10   declaration?

11   A.   Yes.

12   Q.   Does that document contain your handwriting?

13   A.   Yes.

14   Q.   Where?

15   A.   Check marks on the right.

16   Q.   I'm now showing you what I've marked as Defendants'

17   Exhibit B.  Do you recognize that document?

18   A.   Yes.

19   Q.   Is Defendants' Exhibit B the Gomez arbitration agreement

20   that you reference in your declaration?

21   A.   Yes.

22            MS. KINSLEY:  I have no further questions, your Honor.

23            THE COURT:  Thank you very much.

24            MS. KINSLEY:  I would offer Defendants' Exhibit A, B,

25   and D into evidence.

1          THE COURT:  They are in evidence.  Thank you.

2          (Defendants' Exhibits A, B, D received in evidence)

3   CROSS-EXAMINATION

4   BY MR. ROTH:

5   Q.  Okay.  Good morning, Mr. Barnes.

6   A.  Good morning.

7   Q.  You had your deposition taken last week; is that correct?

8   A.  Yes.

9   Q.  During that deposition you were asked various questions

10  about the fact that -- Defendants' Exhibit D?

11  A.  Yes.

12  Q.  Do you recall that?

13          You stated that the check marks on the right were the

14  arbitration agreements you collected; isn't that correct?

15  A.  Yes.

16  Q.  If the arbitration agreement, the check marks on the right,

17  weren't made, then you didn't collect them; is that correct?

18  A.  Yes.

19  Q.  Okay.  The only way and the main way that you remembered

20  collecting any of these was by the check marks; correct?

21  A.  Yeah, that's what you asked me.

22  Q.  And you responded that --

23          THE COURT:  The court reporter wanted to speak to the

24  witness.  Speak up, sir.

25  Q.  You stated that the check marks, people with the check

1    marks, these were the people you collected the arbitration

2    agreements from?

3    A.  Yes, I agree.

4    Q.  Do you recall giving testimony also in that you

5    collected -- that there's some people who you gave the

6    arbitration agreements to, about 80 percent of them signed

7    right there, no hassle, and gave them back to you.  Do you

8    remember that testimony?

9    A.  Yes.

10   Q.  I asked you who did you give it to and who did you get it

11   back from that, based on your recollection that you -- that

12   gave you no hassle, and you gave us a list of people.  And in

13   that list of people, there were a person named Ronnie, who

14   doesn't seem to be on your checklist.

15   A.  Yeah.

16   Q.  Okay.  Is that the same person on the checklist or is that

17   two Ronnies or something else?

18   A.  May I see the name.

19   Q.  Sure.  I think you have it in front of you, D-1.  Do you

20   have your list?

21           MS. KINSLEY:  I have the exhibits.

22           MR. ROTH:  Okay.  I'm sorry.  Here you go.

23           Your Honor, if I can approach the witness?

24           THE COURT:  Sure.

25   BY MR. ROTH:

1   Q.  All right.  This is the list.

2           THE COURT:  Excuse me.  Would you speak loudly enough

3   for the court reporter to take you down and for me to hear.

4           MR. ROTH:  Okay.

5   Q.  We're looking at D-1, and there's four -- five check marks

6   on the right-hand side.  Those are yours; correct?

7   A.  Yes.

8   Q.  Okay.  Then down here it says Ronald something.  That's

9   Ronnie, is that correct, who worked at your club back then?

10  A.  Yes.

11  Q.  Okay.  And he does not have a check mark; correct?

12  A.  No.

13  Q.  Okay.  Do you recall giving, on page 54 of Exhibit I,

14  page 54 -- you don't have it -- but do you recall being asked

15  these questions and giving these answers:

16  "Q.  How many people just signed it and gave it right back to

17  you or within a short, like, a couple of minutes?"

18          This is on page 53, line 18.

19  "A.  I'd say about 80 percent.

20  "Q.  Do you recall which of those people are?

21  "A.  Yeah, for the most part, yeah."

22          At the top of 54.

23  "Q.  So what are their names?

24  "A.  Yvonne, Stacy -- Yvonne, Stacy, Stephanie, Betty.  I'm

25  drawing a blank on all the workers right now.  Carlos, Lewis.

F8IHGOMH                          Barnes - cross

If I had a list, I could read them off to you perfectly.  Let's

see.  Kwame, Eric, couple of security that don't work there

anymore.  I can't think of their names any.  Daisy, Ricky,

Mayra, Anastasia, Christina, Christine -- excuse me, Christine,

Christina, Ronnie, Chris."

          And you're saying they just signed it gave it back to

you; is that correct?

A.  Yes.

Q.  Now, you initially testified that you got a stack of

arbitration agreements, they were blank, you handed them out

blank, and they came back to you filled in; is that correct?

A.  Yes.

Q.  And they were all the same; correct?

A.  Yes.

Q.  Okay.  You didn't change them, you didn't alter the

document, you didn't --

          THE COURT:  You are going so fast.

          MR. ROTH:  Sorry, Judge.

Q.  You did not change them?  You did not alter them?

          THE COURT:  That's three questions.

          You did not change them; is that correct?  Did you

make any changes?

          THE WITNESS:  No.

          THE COURT:  Did you make any alterations?

          THE WITNESS:  No.

1          THE COURT:  That's how you ask a question.  Don't give

2     a speech.  Ask a question.

3     BY MR. ROTH:

4     Q.  Everybody got the same -- all the employees got the same

5     arbitration agreement; correct?

6     A.  Yes.

7     Q.  Once they were signed, then you put them out for Mr. Capeci

8     to sign, and you never saw them again; is that correct?

9     A.  Yes.

10    Q.  So when you got them, they're blank, they go to the

11    employee, they get signed, then they go up to the manager's

12    desk for Mr. Capeci; correct?

13    A.  Yes, sir.

14          MR. ROTH:  Okay.  No further questions.

15          MS. KINSLEY:  No redirect.

16          THE COURT:  Thank you, sir.  You may step down.

17          (Witness excused)

18          MS. KINSLEY:  I would just remind Mr. Barnes that he's

19    subject to the exclusion.  So he'll need to leave.

20          THE COURT:  No, he's testified.  He can stay now.

21    He's welcome to stay.

22          MS. KINSLEY:  We call Anthony Capeci.

23     ANTHONY CAPECI,

24        called as a witness by the Defendants,

25        having been duly sworn, testified as follows:

1         MS. KINSLEY:  May I approach the witness, your Honor?

2         THE COURT:  Yes, you may.

3    DIRECT EXAMINATION

4    BY MS. KINSLEY:

5    Q.  Mr. Capeci, I am showing you what I've marked as

6    Defendants' Exhibit D.  Do you recognize this document?

7    A.  Yes.

8    Q.  Does that document bear your signature on page 3?

9    A.  Yes, it does.

10   Q.  Is that a declaration that you previously entered into for

11   the purposes of this hearing today?

12   A.  Yes.

13   Q.  Does it contain your true and correct testimony?

14   A.  Yes.

15   Q.  I'm now showing you what I've marked as Defendants'

16   Exhibit B.  Do you recognize that document?

17   A.  Yes.

18   Q.  Does that document contain your signature?

19   A.  Yes.

20   Q.  And is that the Gomez arbitration agreement that you

21   reference in your declaration?

22   A.  Yes.

23   Q.  I'm now showing you what I've marked as Defendants' Exhibit

24   C.  Do you recognize that document?

25   A.  Yes.

F8IHGOMH                       Capeci - cross

```
 1    Q.  Is that the Gomez employment application that you reference

 2    in your declaration?

 3    A.  Yes.

 4    Q.  Are Exhibit B and Exhibit C business records that you keep

 5    in conjunction with your role as MLB Enterprises president?

 6    A.  Yes.

 7              MS. KINSLEY:  No further questions, your Honor.  And I

 8    offer Defendants' Exhibits C and E into evidence.

 9              THE COURT:  Admitted.

10              (Defendants' Exhibits C and E received in evidence)

11              MR. ROTH:  Your Honor, in between the time that

12    Mr. Capeci testified, we got his original.  I'd like to hand

13    that up to the Court so that it's the official transcript.

14              THE COURT:  I don't need it.

15              MR. ROTH:  Okay.

16    CROSS-EXAMINATION

17    BY MR. ROTH:

18    Q.  Mr. Capeci, do you recall testifying --

19    A.  Capeci.

20    Q.  Capeci, I apologize.  I think I made that mistake four

21    times at deposition.  I apologize.

22              Would you agree that it was not the practice of MLB

23    Enterprises at Lace to make any copies of documents, is that

24    correct, of the -- back in September of 2014 -- strike that

25    question.
```

F8IHGOMH                         Capeci - cross

1              Mr. Capeci, do you recall testifying -- back in
2    September of 2014 before you started scanning, did you keep all
3    of the original documents that employees signed, whether
4    employment applications, arbitration agreements, in a box?
5    A.  We tried to, yes.
6    Q.  Okay.  At some point in time, you started using arbitration
7    agreements; is that correct?
8    A.  Yes.
9    Q.  You started using arbitration agreements back in September
10   of 2014; is that correct?
11   A.  Approximately.
12   Q.  In conjunction with that, you created an arbitration
13   agreement, is that right, on computer; is that correct?
14   A.  I didn't create it.  I copied it.
15   Q.  Okay.  Where did you copy did from?
16   A.  From an attorney.
17   Q.  And it was at that time in September 2014?
18   A.  Approximately.
19   Q.  Okay.  At some point in time, in conjunction with this
20   case, did you save the file that you had created and provided
21   to your attorney on a thumb drive, the actual --
22   A.  Your question is incorrect.  I didn't provide it to the
23   attorney.  The attorney provided it to me.
24   Q.  -- computer file?
25              The document -- was there a document exchanged -- was

F8IHGOMH                          Capeci - cross

1    there a thumb drive exchanged with my office?

2    A.  Yes.

3    Q.  Okay.  What was the source of that thumb drive?

4    A.  The source of the thumb drive was the current arbitration

5    agreement that's on computer in the office.

6    Q.  Now, when you were giving instructions to your staff at

7    Lace, it was to get the documents signed and filled in by the

8    employees and then come back for your signature; correct?

9    A.  Yes.

10   Q.  Once that happened, once you signed it, then you would have

11   been -- at that point in time you would have been in possession

12   of an original of your signature and the other person's

13   signature at the moment of you signing it; correct?

14   A.  I would assume so.

15   Q.  At that point the original, back in September of 2014, was

16   just put in a box which went up to the third floor in storage;

17   is that correct?

18   A.  I don't recall specifically, but that's what should have

19   happened.

20   Q.  Do you recall that you understood the arbitration agreement

21   to stop the employees from being able to sue you in court?

22          MS. KINSLEY:  Objection.  Calls for a legal

23   conclusion.

24          THE COURT:  Oh, no.  Oh, come on.  Answer the

25   question.

F8IHGOMH                      Capeci - cross

1          THE WITNESS:  No, it doesn't prevent them from suing

2     me in court.  It prevents them from -- forces them into an

3     arbitration.  Obviously, we're in court now.

4     BY MR. ROTH:

5     Q.  Right.  But, essentially, the purpose of this document was

6     that you are going to tell your employees you can't come to

7     court and you can't institute a class action against me; is

8     that correct?

9     A.  That's the intent.

10    Q.  You were going to use this in your defense, as you're

11    trying to here today; correct?

12    A.  Yes.

13    Q.  Did you make any special attempts to secure those documents

14    knowing that they were going to be used for litigation at all?

15    Did you take any steps other than putting them in the box?

16    A.  Not at that time, no.

17    Q.  Okay.  Do you recall being asked this question and giving

18    this answer at your deposition, page 54, line 2:

19    "Q.  It has been represented to the plaintiffs in this case

20    that the actual original arbitration agreement for Jacqueline

21    Gomez cannot be found.  Does it make any sense to you that the

22    original would not have been in that box?

23    "A.  Does it make any sense?  Well, it is what it is.  Reality

24    is reality.  Why?  How?  Where?  I have no idea.

25    "Q.  So my next question would be, was it the practice when

1  they filled out an arbitration agreement to make a copy of that

2  on top of the original?

3  "A.  No."

4  A.  Can you ask me a question.

5          THE COURT:  The question was were you asked those

6  questions at your deposition and did you give those answers?

7          THE WITNESS:  I seem to recall that, yes.

8          THE COURT:  Thank you, sir.

9  Q.  I'm going to ask you to take a look at Plaintiffs'

10  Exhibit F.  This is the licensing agreement.  Do you recall

11  seeing that?

12  A.  Yes.

13  Q.  What is the reason that you -- there's a cross-out on the

14  signature page?

15  A.  They misspelled my last name.

16  Q.  Okay.

17          THE COURT:  Everybody's name's misspelled.

18  Q.  Now, when you were asked to find Ms. Carrasco's original,

19  you were able to find her original arbitration agreement;

20  correct?

21  A.  Yes.

22  Q.  And you were able to find Ms. Gomez's original employment

23  application; correct?

24  A.  Yes.

25  Q.  And you were able to find Ms. Carrasco's original

F8IHGOMH                    Capeci - cross

 1   employment agreement; correct?

 2   A.  Yes.

 3   Q.  But you can't find the original of Ms. Gomez's?

 4   A.  Yes.

 5   Q.  Do you also recall that you testified about at the time

 6   these arbitration agreements were being given out that you had

 7   to stay on top of the managers to get them signed?  Do you

 8   remember that?

 9   A.  That -- yes, there was more than one request made to get

10   them all signed and returned.

11   Q.  Okay.  You were staying on top of the managers at that

12   point to make sure that they accomplished this task; correct?

13   A.  I don't know your definition of staying on top of the

14   managers.

15   Q.  Okay.  Did you make multiple requests to the managers and

16   even cause them to create a list for everything that was not

17   done and try -- for all the arbitration agreements that were

18   not signed and get them signed?

19   A.  Yes.

20            MR. ROTH:  I have no further questions.

21            MS. KINSLEY:  No redirect.

22            THE COURT:  Thank you very much, Mr. Capeci.

23            (Witness excused)

24            MS. KINSLEY:  We have no further witnesses.

25            THE COURT:  Okay.  Why don't you take ten and then

F8IHGOMH                    Summation – Ms. Kinsley

1    come back, and you can argue your respective positions.

2                MS. KINSLEY:  Your Honor, while there's a break, may I

3    provide Defense Exhibit F, the exemplars to be copied?

4                THE COURT:  We'll make a photocopy.

5                MS. KINSLEY:  Thank you.

6                (Recess)

7                MR. ROTH:  Your Honor, I wanted to clarify something.

8                THE COURT:  Yes.

9                MR. ROTH:  Because you said you had read his

10   deposition, I didn't offer them.

11               THE COURT:  I read his deposition.

12               (Pause)

13               THE COURT:  Okay.  All right.  I'll hear from the

14   defendant first and then the plaintiff.

15               MS. KINSLEY:  Thank you, your Honor.

16               This case is very simple, and it all boils down to one

17   question:  Whether Jacqueline Gomez's signature on the

18   arbitration agreement is authentic and hers or not.  There is

19   sufficient evidence before the Court today to demonstrate that

20   the signature is authentic and that the agreement is

21   enforceable.

22               As the Court heard from Mr. Capeci in his declaration,

23   as owner of the business, he instituted a policy last fall that

24   all employees must sign an arbitration agreement as a condition

25   of their continued employment.  Part and parcel with this

policy, Mr. Barnes, as manager of the club, provided the

arbitration agreement to Ms. Gomez.  He remembers doing that;

and, in actuality, she didn't dispute that she received it.

Mr. Barnes also remembers receiving the agreement back from

Ms. Gomez with the signature; and, in fact, he made a check

mark on the list of names of employees who had not yet returned

their agreement.  You have that before you.  It's Defendants'

Exhibit A.  From there the document was forwarded to Mr. Capeci

who signed it, and he has testified to that as well.  The

document was then maintained in the regular course of business

as part of a regular business activity of MLB Enterprises.

     One word about Mr. Picciochi, the plaintiffs' document

examiner.  He reached no opinion about the authenticity of the

signature.  So, in essence, his testimony is a wash.  It

provides no assistance to us in determining whether Ms. Gomez

did or did not sign the agreement.

     However, I would encourage the Court to review the

signature.  Mr. Picciochi may not have been able to reach an

opinion, but your Honor can.  The signatures on the employment

application, which Ms. Gomez admits signing, and the

arbitration agreement, which she disputes, are very similar.  I

would also encourage the Court to take a look at Defendants'

Exhibit F, which are all of the handwriting exemplars provided

by Mr. Picciochi.  I have reviewed them myself this morning,

and there are many of Ms. Gomez's signatures contained in

 1   Defendants' Exhibit F which are less similar, much less

 2   similar, to the signature that's contained on the arbitration

 3   agreement.  She does not dispute that those were her

 4   signatures.  She only disputes this one, and many of them look

 5   different.

 6         The Court need not find that Ms. Gomez lacks

 7   credibility or that she is, in fact, lying today in order to

 8   reach the conclusion -- and nor am I suggesting that she is --

 9   in order to reach the conclusion that she did, in fact, sign

10   the arbitration agreement.

11         THE COURT:  I don't see how that could possibly be.

12         MS. KINSLEY:  She may be confused about what she

13   signed or did not sign.  Certainly, Mr. Barnes --

14         THE COURT:  I don't know.  She's not the one who had

15   confusing and lax recordkeeping policies.

16         MS. KINSLEY:  Yes, your Honor.  There is evidence in

17   the record that suggests that the recordkeeping here could have

18   been --

19         THE COURT:  Could?

20         MS. KINSLEY:  -- could have been more in order.  I

21   would agree with that.

22         THE COURT:  I know you can't say more than that.  It's

23   your client.  Never insult your client when he's sitting right

24   behind you.

25         MS. KINSLEY:  I agree, your Honor.  And I would note

1    that this is a service industry business.  This is not an I.T.

2    company.  It's not a sophisticated office with fancy computer

3    equipment or lots of individuals who are trained in how to

4    maintain documents as part of the business.  This is a service

5    business.  It's a bar and it's a gentlemen's club.  So

6    recordkeeping is not the business that they are necessarily in.

7    They did the best that they could.

8           The key here is that Mr. Barnes recalls giving and

9    receiving the signed agreement back.  Mr. Capeci signed it and

10   maintained it.  We submit that's sufficient evidence for the

11   Court to find that this agreement was signed by Ms. Gomez and

12   is enforceable and that the case should be sent to arbitration.

13   Thank you.

14          THE COURT:  Give me one minute.  Okay.

15          Okay.  I'll hear you.

16          MR. ROTH:  Thank you, your Honor.

17          Ms. Gomez denies signing the agreement that was

18   produced by the defendants.

19          THE COURT:  I'd have to find her to be a liar in order

20   to rule against her?

21          MR. ROTH:  Those words didn't come out of my mouth,

22   your Honor.

23          THE COURT:  No, but she's your client.  She's sitting

24   right behind you.  But she flatly denies having --

25          MR. ROTH:  That's right.

1           THE COURT:  Flatly denies it.

2           MR. ROTH:  That's right.  And the defendants could not

3     produce the original agreement, but without doubt, they had

4     last possession of it because there was no original until

5     Mr. Capeci signed the agreement.

6           Additionally, the testimony was it was a practice of

7     Lace not to make copies.  So how did this copy come to ever

8     exist?  They should only have the original.  They shouldn't

9     have a copy without some further explanation.

10          Mr. Capeci is a CPA.  He testified that because of --

11    as he said in his deposition, because of the lawsuits, he was

12    instituting arbitration agreements, and he knew that those

13    arbitration agreements and class action waivers were for the

14    sole purpose of preventing a person from bringing a lawsuit in

15    federal court, and they would have to go to arbitration.  They

16    couldn't bring a class action.  And full well knowing that that

17    is the sole purpose of this document, they took no special

18    steps to preserve it, or maybe they did, because they seem to

19    have had Ms. Carrasco, who admitted to signing the document,

20    they had her original.  They had the original of the employment

21    application that was kept in this box, but they could not find

22    the original of Ms. -- of this document.

23          The testimony was that all of these arbitration

24    agreements are the same.  As the Court pointed out, you do not

25    need to be a forensic document examiner to see that these are

1    different, completely different documents.  There is no

2    similarity to these documents -- excuse me, there's similarity.

3          THE COURT:  There's a lot of similarity.  There were a

4    few differences.

5          MR. ROTH:  But the thing is that -- your Honor, I

6    misspoke.  I misspoke.

7          THE COURT:  Right.

8          MR. ROTH:  I overreached.

9          THE COURT:  You don't need to overreach.

10         MR. ROTH:  Yes, I'm sorry.  So these documents are

11   different.  There's no question that the testimony was we

12   provided the same document to everybody, and they signed it.

13   The defendants did not even attempt to explain why the

14   signature pages on these documents have the differences.

15         I'm not going to go over all of the differences.

16   They're obvious to the Court.  The plaintiffs' expert --

17         THE COURT:  You can do what you want.  It's not the

18   most persuasive evidence that you've offered.

19         MR. ROTH:  That the documents have -- that there's a

20   bracket around MLB?

21         THE COURT:  Yes.

22         MR. ROTH:  There's no evidence that they produced any

23   other arbitration agreement.  There was one arbitration

24   agreement.  And then even then, under Exhibit J, if you look at

25   Exhibit J, which they got into -- which they obtained in 2015,

62

1   it matches the Carrasco signature page.  It does not match her

2   signature page, and that was the form that was being

3   promulgated at the club at that time.  There's been no

4   explanation whatsoever by the defendants herein as to how that

5   could possibly be.  How could these forms be different if they

6   only used one form?  And the testimony was everybody got the

7   same form.

8          Additionally, I think that there's questions of

9   Mr. Barnes saying that he got it back from people, that it had

10  check marks, but yet he testified that there were other people

11  that he received it -- that he gave the documents to and he got

12  it back.  And somehow he remembers Ms. Gomez's, but the check

13  marks on his paper don't match his testimony saying that he got

14  back documents from other people, which he clearly testified

15  that he did not get back.

16         The plaintiffs' expert was honest in that he could not

17  make a determination because the signature of Ms. Carrasco is

18  not specific enough; and, therefore, the original was crucial.

19  The original was crucial to his analysis.  And the fact that it

20  was not complex and it's -- he said it's an easy signature to

21  imitate, that issue is certainly not -- is something anybody

22  can say, hey, that those signatures look similar.

23         So even the expert said, Hey, they look too similar

24  for you to make a definitive statement one way or the other.

25  The defense would have you say, and anybody could look at it

1    and make it, but he said he couldn't.  The fact that the

2    original's not available, we couldn't do the ink testing, he

3    couldn't look at it under a microscope, he couldn't do all of

4    the different testing that is available.

5            Additionally, one of the other things is that these

6    documents were signed the same day by Mr. Capeci, and they were

7    dated the same day.  Ms. Gomez says she wasn't there that day.

8    There's -- clearly these documents, the testimony was there was

9    only one of them, yet they're dated the same day and they're

10   different.

11           Additionally, there was pressure on the managers to

12   get these things signed.  So who knows what happened with this?

13   And the testimony also was that the signature of Mr. Capeci

14   doesn't have natural variation between those two documents that

15   were produced for the Court and that were produced to us.  And

16   the other thing is that as -- in our submission, all of these

17   documents were produced by the defendants to us except for

18   Exhibit J, which was sent by her friend.

19           Your Honor, I would submit to you that if you're going

20   to use a document and your company has a practice of not making

21   copies and that the documents are different and that you can't

22   find the original, you have to come up with some other

23   explanation, better explanation, than it is what it is to keep

24   Ms. Gomez out of the courthouse.

25           THE COURT:  Okay.  Why don't you guys give me ten

F8IHGOMH                    Summation - Mr. Roth

1    minutes, and I'll tell you what the answer is.  Okay.

2              (Recess)

3              THE COURT:  Okay.  The bottom line is that Jacqueline

4    Gomez's signature on her arbitration agreement is a forgery,

5    and she never signed the document.  Therefore, while Yashira

6    Carrasco must arbitrate, and this action as to her stayed

7    pending arbitration, Ms. Gomez may litigate, and as to her, the

8    motion to stay or dismiss pending arbitration is denied.

9              Herewith the reasons I have reached as conclusion:

10             (1) I find Jacqueline Gomez to be a credible witness.

11             (2) While there is no expert testimony opining that

12   Ms. Gomez's signature is not authentic, it's my conclusion as

13   the finder of fact that Ms. Gomez's signature -- which is not a

14   signature at all, it is a swirl; it is a scrawl; there is not a

15   single recognizable letter in it -- would be extremely easy to

16   imitate.  I looked at it for a long time yesterday, and I did

17   not originally intend to look at the other exemplars.  I looked

18   at it both on her employment application and arbitration

19   agreement.  I didn't originally intend to look at the

20   exemplars, but at Ms. Kinsley's invitation, I did look at them,

21   and all the signatures look similar.  They're all scrawls in

22   roughly the same form with that big curlicue at the end.  It's

23   just a curving line.  It's not handwriting at all.  And I

24   suspect that even I, who have absolutely no artistic talent,

25   could come up with a credible facsimile of that curving line.

1          (3) The persuasive evidence, in addition to

2    Ms. Gomez's credible testimony, is the fact that Ms. Gomez is

3    unlikely to have been the person who printed her name and date

4    on the arbitration agreement that is attached to her affidavit

5    as Exhibit A.  Her printed name is misspelled.  I do not

6    believe that Ms. Gomez misspelled her own name.  The date

7    contains dashes between the numbers, whereas when she dated her

8    employment agreement, the only comparator document that I had

9    prior to the hearing, Ms. Gomez used slashes, not dashes,

10    between the numbers.  Ms. Gomez also used slashes every time

11    she dated a document in Defendant's Exhibit F, the comparators.

12    I can see that.  I don't need a questioned documents expert to

13    point that out.  In fact, I think the questioned documents

14    expert's testimony is pretty much a waste of time in this case.

15          I've looked long and hard at Ms. Gomez's employment

16    application, the only comparator I had prior to the hearing,

17    and I do agree with the testimony of Mr. Picciochi that a

18    different person printed Ms. Gomez's name on her employment

19    application and on the arbitration agreement.  And you have now

20    heard all the testimony of Mr. Picciochi that consider to be

21    relative or probative of anything in this case.

22          (4) I've considered the possibility that Ms. Gomez

23    might have signed the arbitration agreement while someone else

24    filled in the printed information.  I reject that possibility.

25    The testimony of every witness in this case was to the effect

1      that the employee was required to sign the arbitration

2      agreement and print his or her name on the agreement and put

3      the date on the agreement.  That was the customary practice.

4      No witness has testified that the customary practice was not

5      followed in the case of this particular employee, and I would

6      be speculating if I were to conclude that the customary

7      practice was not followed in the case of Ms. Gomez.

8              (5) Ms. Gomez also testified credibly that she was

9      sent a second copy of the arbitration agreement, somewhat

10     modified from the version that she ostensibly signed but really

11     didn't sign, in January 2015.  There would have been no reason

12     to send her a second copy if she signed the first one she was

13     given.

14             (6) I do not credit the testimony of Mario Barnes that

15     he received a signed copy of the arbitration agreement back

16     from Ms. Gomez.  I attach no significance to the fact that

17     Ms. Gomez's name was crossed off a list of names of employees

18     who had not yet returned their arbitration agreements.  There

19     is no way to know when that list was created or when her name

20     was crossed off.

21             (7) However, to the extent that the list proves

22     anything, it tends to prove that Ms. Gomez did not sign the

23     arbitration agreement on September 24, 2014, which is the date

24     on which she purportedly signed it, since it's the date that's

25     inserted on Plaintiff's Exhibit A-2.  The list was supposedly

F8IHGOMH                    Summation - Mr. Roth

1    created to monitor delinquencies, people who did not return the

2    agreement after it was given to them.  It was created because

3    the managers needed prodding to get the signed documents back.

4    It is called "Missing Arbitration," but September 2014 is when

5    the arbitration agreements were created and passed out.

6    Mr. Capeci so testified in his affidavit, and I credit that

7    testimony.  I also credit the testimony of Mr. Barnes that this

8    new practice occurred in the fall of 2014, and the fall did not

9    begin until around September the 21st.  So if Ms. Gomez signed

10   the agreement on September 24, 2014, the third day of the fall

11   of 2014, there was absolutely no reason to put her name on a

12   delinquent list.  Infinitely more persuasive evidence than a

13   questioned documents expert.

14           (8) I have considered and rejected the possibility

15   that the list that Mr. Barnes testified about is a list of all

16   employees who were given the agreement to sign.  First of all,

17   no one testified that that was what the list is.  Second, at

18   his deposition, Mr. Capeci testified that there were many more

19   employees at the club at any one time than the 11 persons who

20   are reflected on this list.  At any given time there were about

21   ten waitresses, four bartenders, four bar-backs, two hosts, six

22   to eight security -- 26 to 28 people at any given time, in

23   addition to Mr. Capeci and his three managers, as well as the

24   dancers who Mr. Capeci said are independent contractors.  And,

25   of course, there's likely some turnover from time to time.  For

1    example, I believe Ms. Carrasco was hired in January of 2015.

2    So 26 to 28 is a low number for total employees who would have

3    been required to sign an arbitration agreement, and there are

4    only 11 names on the list.

5         (9) The fact that no original can be found, when the

6    representatives of defendants testified credibly that they

7    retained the original and never made photocopies of those

8    originals, is simply inexplicable.  It defies belief there

9    would be a photocopy of Jacqueline Gomez's arbitration

10   agreement but no original, but no other photocopies of

11   agreements and all originals.

12        (10) I do not know why Ms. Gomez was not fired when

13   she did not return a signed arbitration agreement.  Mr. Capeci

14   did testify that that was his policy.  I suspect that the

15   failure to conform to policy was an oversight due to the

16   careless recordkeeping and lax management style that Mr. Capeci

17   forthrightly testified was followed at his company.  But I need

18   not speculate about the matter.  The fact is I do not believe

19   that Ms. Gomez signed the arbitration agreement, and I deny the

20   motion to dismiss or stay pending arbitration as to her.

21        So I suspect that this action is going to be going

22   forward not as a class action, because I suspect you're not

23   going to find that there are very many people who didn't sign

24   that arbitration agreement.  Am I guessing correctly?

25        MR. ROTH:  Your Honor --

1          THE COURT:  Not you.  He's the plaintiff, the master

2     of his complaint.

3          MR. ROTH:  Your Honor, New York State goes back six

4     years, and they only started signing them in September of 2014.

5     And as you correctly pointed out, that there is high turnover,

6     and I believe that there's many numerous -- you know, possibly

7     hundreds, I have no idea at this point in time, but the

8     testimony was off the cuff ten to -- there was a lot of

9     employees that were listed.  And at this point in time, it

10    seems, if you can go back six years on the Rule 23 and three

11    years on the FLSA, that there is the potential to have a

12    numerosity in this case.

13         THE COURT:  Okay.  You have 45 days to take discovery

14    on class issues, and you have to make your motion -- you have

15    until the end of September to take discovery on class issues,

16    and you have to make your motion -- you're going to make a 216

17    motion or are you going to make a Rule 23 motion also?

18         MR. ROTH:  Your Honor, generally what we've done is we

19    do the 216 first.

20         THE COURT:  Yes, I know that.  I'm aware of that.

21         MR. ROTH:  And then depending on what happens there,

22    since it's a much lower standard, then we move for Rule 23 at

23    the same time as they decertify is usually -- or sometime after

24    that, once the class discovery gets going.

25         THE COURT:  You have until October 16 to make your

F8IHGOMH                    Summation - Mr. Roth

1   motion, your 216 motion.  On November 6, for a response from

2   the defendant.  November 13 for a reply.

3          Meanwhile, Rule 26 discovery can proceed as to

4   Ms. Gomez, which is to say that all of the records relating to

5   her hours, her pay, her tips, her whatever, should be assembled

6   and produced to plaintiff's counsel.  Okay.  Ms. Carrasco has

7   to go to arbitration.

8          There you have it.  You have a schedule.

9          MR. ROTH:  Your Honor, you said that very fast.  The

10  last part, it said --

11         THE COURT:  Get the transcript.

12         MR. ROTH:  Okay.  Thank you, your Honor.

13         THE COURT:  I'm going to get a copy of the transcript

14  because I'm going to file it.  That's the opinion.  All right.

15         MR. ROTH:  Thank you, your Honor.

16         MS. KINSLEY:  Thank you, your Honor.

17         THE COURT:  All right.  Thank you, everybody.

18         (Adjourned)

19

20

21

22

23

24

25